**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
       *Plaintiff-Appellee,*

DANIEL HARTOG,
       *Claimant-Appellant,*

    and

VICTOR A. CARBONNEAU; TOTAL
FINANCIAL COMPANY LIMITED;
TOTAL AVIATION CONSULTANTS
LTD.,
       *Claimants,*

       v.

APPROXIMATELY $1.67 MILLION
(US) IN CASH, STOCK, AND OTHER
VALUABLE ASSETS HELD BY OR AT:
1) TOTAL AVIATION LDT., ACCOUNT
NO. 7092686, LOCATED AT
BARCLAYS BANK PLC, GRAND
CAYMAN, CAYMAN ISLANDS, BRITISH
WEST INDIES; 2) DEACON
BARCLAYS DE ZOETE WEDD LIMITED,
ACCOUNT NO. 13603A-2 AKA
BARCLAYS PRIVATE BANK & TRUST
CM1633, LOCATED AT BARCLAYS
PRIVATE BANK & TRUST (CAYMAN)
LIMITED, GRAND CAYMAN, CAYMAN
ISLANDS, BRITISH WEST INDIES;

No. 05-16614

D.C. No.
CV-98-02360-JL

OPINION

3) TOTAL FINANCIAL CONSULTANTS
LTD., ACCOUNT REFERENCE 310205-
633500, LOCATED AT THE BARCLAYS
PRIVATE BANK & TRUST (CAYMAN)
LIMITED, GRAND CAYMAN, CAYMAN
ISLANDS, BRITISH WEST INDIES; 4)
CASHIERS CHECK 11405244-152
IN THE AMOUNT OF $85,000 (US),
DRAWN AT THE ROYAL BANK OF
CANADA, GEORGETOWN, GRAND
CAYMAN, CAYMAN ISLANDS, BRITISH
WEST INDIES, ON OR ABOUT MARCH
20, 1995; AND 5) CASHIERS CHECK
11405244-141 IN THE AMOUNT OF
$21,250 (US) DRAWN AT THE
ROYAL BANK OF CANADA,
GEORGETOWN, GRAND CAYMAN,
CAYMAN ISLANDS, BRITISH WEST
INDIES, ON OR ABOUT MARCH 17,
1995,

*Defendants.*

Appeal from the United States District Court
for the Northern District of California
James Larson, Magistrate Judge, Presiding

Argued and Submitted
August 15, 2007—San Francisco, California

Filed January 22, 2008

Before: Diarmuid F. O'Scannlain, Michael Daly Hawkins,
and Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw

**COUNSEL**

David A. Nickerson, San Rafael, California, for the claimant-appellant.

Kevin V. Ryan, United States Attorney, Barbara J. Valliere, Assistant United States Attorney, and Stephanie M. Hinds, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellee.

**OPINION**

WARDLAW, Circuit Judge:

Daniel Den Hartog, a twice-convicted drug smuggler and trafficker who had on deposit in certain Cayman Island bank accounts $1.67 million in alleged drug trafficking proceeds, appeals the grant of summary judgment in favor of the United

States in its civil forfeiture action filed in the United States District Court for the Northern District of California. We must decide whether (1) the district court applied the correct jurisdictional standard and properly found that it had *in rem* jurisdiction over the forfeited funds; (2) the government met its burden of demonstrating probable cause to seize the funds, so as to warrant summary judgment; and (3) the five-year delay between the government's seizure of the funds in August 1993 and the filing of this action in June 1998 violated Hartog's due process rights. Because we conclude that jurisdiction properly lies in the Northern District of California, that Hartog failed to adduce a genuine issue of material fact that the funds derived from legitimate sources, and that Hartog suffered no prejudice due to the government's delay, we affirm the district court.

## I.   BACKGROUND

Hartog's entanglement in the drug trade stretches back nearly thirty years. In 1979, Hartog had been convicted of conspiracy to transport 1,066 kilograms of marijuana in the State of Arizona. That conviction, however, did not dissuade Hartog from continuing his involvement in drug trafficking. Numerous reports from the Federal Bureau of Investigation detail statements from Hartog's former associates implicating him in continued drug-smuggling efforts throughout the 1980s. Marijuana smuggled into the United States in 1987 eventually led to Hartog's 1992 arrest and sentence to fifteen years imprisonment.

The planning for the 1987 scheme, which involved two separate shipments, began as early as 1986. In December 1986, Hartog told Seth Booky, a business associate, that the two shipments consisted of a smaller load of approximately ten tons and a second "big" load.[1] A month later, Hartog,

---

[1]Seth Booky was arrested in June 1987 due to a separate marijuana sale and then agreed to cooperate with the government, including by taping conversations with Hartog.

Booky and three other co-conspirators met in Carmel, California, where Hartog claimed ownership over half of the shipment and granted Booky part of the distribution rights. Over the following months, Hartog held a series of meetings with associates in San Francisco and Carmel where it was decided to smuggle the first load through Hawaii and the second through Seattle. To effectuate the plan, Booky procured false identifications for Hartog and other participants. Booky mailed these false documents to Hartog in Monterey.

After traveling to Asia to orchestrate the impending delivery, Hartog informed Booky in May that both shipments were imminent. In July 1987, U.S. Customs officials seized nearly twelve tons of marijuana bound for Hawaii and made seven arrests related to the shipment. Despite the ongoing investigation, the government failed to interdict the second (and larger) planned shipment. The setback did not appear to deter Hartog. After the interception of the Hawaii shipment, Hartog asked Booky if he still planned on distributing the larger shipment. In August 1987, Hartog told Booky that he soon expected the larger shipment to arrive. Three months later, federal agents found $1.5 million in cash and five kilograms of marijuana inside a Del Rey Oaks, California, storage locker belonging to a co-conspirator. That same month another Hartog associate was arrested in Reno, Nevada as he attempted to launder, with several others, $7.6 million in cash through a local casino.

In February 1990, Hartog was indicted in Hawaii for his role in smuggling the nearly twelve tons of marijuana seized by customs officials three years earlier. Hartog then disappeared and remained a fugitive in Canada. In July 1992, United States Customs Officials lured Hartog back into the country and arrested him. Upon his return, Hartog pleaded guilty to the smuggling charges and was sentenced to fifteen years in prison.

After the arrest and conviction, the government then endeavored to seize the $1.67 million lodged in a Cayman

Islands bank it understood to be proceeds from Hartog's drug trafficking scheme. In August 1993, the United States obtained an order from the Grand Court of the Cayman Islands freezing the funds in several bank accounts held on behalf of a Canadian lawyer named Victor Carbonneau.

The frozen funds had traveled a circuitous route to arrive in the Cayman Islands. Years prior, in the summer of 1988, Hartog, then operating under the alias "Daniel Tucker," met with Carbonneau, ostensibly seeking advice on investment methods that would minimize his Canadian tax liability. Carbonneau suggested that Hartog set up bank accounts in Switzerland. Accepting the advice, Hartog traveled to Geneva where he established several bank accounts and deposited cash and checks that as of 1998 had appreciated into approximately $1.67 million. Due to incessant conflicts between Hartog and the Swiss bank, the funds were transferred several times, first into Carbonneau's personal account in Geneva and later spread among several of Carbonneau's personal bank accounts in the Cayman Islands. During their many meetings, Hartog had told Carbonneau that he inherited the money from his recently deceased father. Once Carbonneau became aware that "Daniel Tucker" was actually "Daniel Hartog" and likely involved in drug smuggling, he barred Hartog from access to the funds.

In June 1998, the government commenced this forfeiture action against the seized funds in the District Court for the Northern District of California. After intermittent discovery, Hartog moved to dismiss the government's action for lack of jurisdiction. Denying the motion, the district court held that it had in rem jurisdiction because it exercised constructive control over the funds. Once the Cayman Islands court had frozen the funds, it subsequently enforced the orders of the United States district court, thereby acting as its agent. The district concluded that this agency relationship established its control over the funds, investing it with in rem jurisdiction.

The government then filed for summary judgment in October 2004. The government asserted there existed no disputed material facts regarding its showing of probable cause that the seized funds derived from Hartog's drug-trafficking and money-laundering activities. The government also contended that Hartog failed to rebut its showing by adducing credible evidence that the funds in fact derived from legitimate sources. Hartog opposed this motion, arguing that a question of fact existed as to the source of the funds and asserting affirmative defenses of lack of probable cause, undue delay and outrageous government conduct. The district court granted the motion for summary judgment, holding that the government provided sufficient probable cause of an illegal source for the funds, including Hartog's "use of an alias, false identification and false claims of Canadian citizenship, coupled with the highly suspicious manner in which he structured the bank accounts." The district court found Hartog's explanation that he inherited the funds from his father not credible. By the terms of his father's will, Hartog was entitled to slightly over $117,000 — ten times less than the amount found in the accounts. The district court further rejected Hartog's affirmative defenses, concluding that Hartog failed to demonstrate prejudice caused by the nearly five year delay in initiating the proceedings.

## II.   DISCUSSION

*A.   Jurisdiction Properly Lies in the Northern District of California.*

[1] Hartog appeals the district court's denial of his motion to dismiss this in rem proceeding for lack of jurisdiction over the subject funds.[2] He and the government agree that the district court erred in concluding it had jurisdiction based on a

---

[2]We review the district court's determination of in rem jurisdiction de novo. *Ventura Packers, Inc. v. F/V Jeanine Kathleen*, 424 F.3d 852, 858 (9th Cir. 2005).

theory of constructive control of the Cayman Islands bank deposits. The correct test, the parties contend, derives from a plain reading of the jurisdictional statute in question, 28 U.S.C. § 1355(b), which provides for jurisdiction in a district "in which any of the acts or omissions giving rise to the forfeiture occurred." The parties dispute whether any of the acts or omissions giving rise to the forfeiture occurred in the Northern District of California. We agree that 28 U.S.C. § 1355(b) does not require the government to establish constructive control of the proceeds to sustain jurisdiction. Rather, applying a plain reading of the statute to the acts giving rise to the forfeiture, we conclude that sufficient acts occurred in the Northern District of California for jurisdiction to lie there properly.

"A forfeiture action is *in rem*. Jurisdiction *in rem* is predicated on the 'fiction of convenience' that an item of property is a person against whom suits can be filed and judgments entered." *United States v. Ten Thousand Dollars ($10,000) in United States Currency*, 860 F.2d 1511, 1513 (9th Cir. 1988). Dating back to early admiralty law, constructive possession of a res had been a prerequisite to establishing in rem jurisdiction. *United States v. James Daniel Good Real Property*, 510 U.S. 43, 57-58 (1993) (*discussing The Brig Am*, 13 U.S. 289, 291 (1815)). Under the traditional paradigm, "the court must have actual or constructive control over the res when an *in rem* forfeiture suit is initiated." *Id*. at 58 (*citing Republic Nat. Bank of Miami v. United States*, 506 U.S. 80, 84 (1992)). The district court followed the traditional paradigm when it ruled that it had jurisdiction based on constructive control over the res.

**[2]** In 1992, however, Congress amended 28 U.S.C. § 1355, which governs federal courts' jurisdiction over civil forfeiture actions. The statute, as amended, provides:

> (b)(1) A forfeiture action or proceeding may be brought in —

(A) the district court in which any of the acts or omissions giving rise to the forfeiture occurred, or

(B) any other district where venue for the forfeiture action or proceedings is specifically provided for in section 1395 of this title or any other statute.

(b)(2) Whenever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government, an action or proceeding for forfeiture may be brought as provided in paragraph (1), or in the United States District court for the District of Columbia.

Senator Alphonse D'Amato of New York, when introducing the bill, clarified how § 1355 would alter the role of constructive control:

Subsection (b)(2) addresses a problem that arises whenever property subject to forfeiture under the laws of the United States is located in a foreign country. As mentioned, under current law, it is probably no longer necessary to base in rem jurisdiction on the location of the property if there have been sufficient contacts with the district in which the suit is filed. . . . No statute, however, says this, and the issue has to be repeatedly litigated whenever a foreign government is willing to give effect to a forfeiture order issued by a United States court and turn over seized property to the United States if only the United States is able to obtain such an order.

Subsection (b)(2) resolves this problem by providing for jurisdiction over such property in the United

States District Court for the District of Columbia, in the district court for the district in which any of the acts giving rise to the forfeiture occurred, or in any other district where venue would be appropriate under a venue-for-forfeiture statute.

137 Cong. Rec. S12183-02, S12239 (Aug. 2, 1991).

Notwithstanding the plain language of the statute and its legislative history, the Second Circuit in *United States v. All Funds on Deposit in any Accounts Maintained in the Names of Meza or DeCastro*, 63 F.3d 148 (2d Cir. 1995) (hereinafter "*Meza*"), found that the requirement of constructive control survived the § 1355 amendments.[3] The court reasoned that "[a]lthough Congress certainly intended to streamline civil forfeiture proceedings by amending § 1355, even with respect to property located in foreign countries, we do not believe that Congress intended to fundamentally alter well-settled law regarding *in rem* jurisdiction." *Id.* at 152. The court concluded that "in order to initiate a forfeiture proceeding against property located in a foreign country, the property must be within the actual or constructive control of the district court in which the action is commenced." *Id.* at 153. Here, the district court principally relied on *Meza* in asserting jurisdiction due to its constructive control of the approximately $1.67 million.

Other circuits have declined to follow this approach, instead applying a plain reading of § 1355. The D.C. Circuit rejected the requirement of constructive control in *United States v. All Funds in Account in Banco Espanol de Credito, Spain,* 295 F.3d 23 (D.C. Cir. 2002) (hereinafter "*Banco Espanol*"). In *Banco Espanol*, the district court had relied on

---

[3]It is unclear whether *Meza* remains good law even in the Second Circuit. In *United States v. Certain Funds Located at the Hong Kong & Shanghai Banking Corp.*, 96 F.3d 20, 22 (2d Cir. 1996), the Second Circuit held that § 1355 conferred in rem jurisdiction without reference to the necessity of constructive or actual control.

the cooperation between Spanish authorities and the district court to establish constructive control over the res. The D.C. Circuit reasoned that Spain's cooperation had no relevance to the district court's jurisdiction: "Spain's compliance and cooperation determines only the effectiveness of the forfeiture orders of the district courts, not their jurisdiction to issue those orders." *Id.* at 27. The plain language of § 1355(b) alone provided jurisdiction, not Spanish compliance. *Id.* Likewise, the Third Circuit declined to follow the Second Circuit's *Meza* decision, holding that § 1355(b) "grants district courts jurisdiction over the property at issue . . . based on the plain language of the statute." *Contents of Account Number 03001288 v. United States*, 344 F.3d 399, 403 (3d Cir. 2003). Mirroring the D.C. Circuit's reasoning, the Third Circuit rejected the idea that the cooperation of the United Arab Emirates in seizing the funds provided the district court with jurisdiction. Rather, § 1355(b) itself provided jurisdiction where the claimant had been convicted for his participation in smuggling heroin into New Jersey and a search of his New Jersey home produced records of the account. *Id*. at 400-03.

**[3]** We find ourselves in agreement with the analysis of the D.C. and Third Circuits. The plain language and legislative history of the 1992 amendments makes clear that Congress intended § 1355 to lodge jurisdiction in the district courts without reference to constructive or actual control of the res. *See Aiken v. Spalding,* 684 F.2d 632, 633 (9th Cir. 1982) ("In statutory construction, the plain, obvious meaning of the language of a statute is to be preferred to a curious or hidden sense."). Where an act or omission giving rise to the forfeiture occurs in a district, the corresponding district possesses jurisdiction over the forfeiture action regardless of its control over the res.

**[4]** The District of Northern California properly exercised jurisdiction over the money in question due to several acts occurring in that district from which the forfeiture action arose.[4]

---

[4]District courts asserting jurisdiction on the basis of § 1355(b) should make clear findings of acts or omissions occurring in the district upon which the court bases its jurisdiction.

The government sufficiently demonstrated that Hartog's marijuana smuggling enterprise, which gave rise to the forfeiture action, had significant interactions with the Northern District. Hartog participated in numerous meetings in San Francisco and Carmel to discuss the importation of marijuana, its distribution, and eventual profit allocation. Hartog used false identifications to shield his identity during the 1987 smuggling mailed to his P.O. Box in Carmel, a city located in the Northern District of California. Moreover, cash and marijuana supporting the effective smuggling of the second load was found in a storage locker of his associate in Del Rey Oaks, less than four miles outside of Monterey, and also located in the Northern District. These acts alone satisfy the statutory requirement of "*any* act" giving rise to the forfeiture occurring within the district and invested the District Court of Northern California with in rem jurisdiction.

### B.  *The District Court Properly Granted Summary Judgment In Favor of the United States.*

**[5]** Because the government filed its complaint before August 23, 2000, we apply 19 U.S.C. § 1615 rather than the subsequently enacted Civil Asset Forfeiture Reform Act, 18 U.S.C. § 983(c). *United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1183-84 (9th Cir. 2002). Under this framework, the government must first establish probable cause that the funds seized are associated with drug trafficking or money laundering. *United States v. $129,727.00 U.S. Currency*, 129 F.3d 486, 489 (9th Cir. 1997). If probable cause is established, the burden of proof then shifts to the claimant, who must prove through a preponderance of the evidence that forfeiture is not appropriate. *$80,180.00 in U.S. Currency*, 303 F.3d at 1184. We review the district court's grant of summary judgment under this statute de novo. *United States v. Ranch Located in Young, Ariz.*, 50 F.3d 630, 632 (9th Cir. 1995).

**[6]** "Determination of probable cause for forfeiture is based upon a 'totality of the circumstances' or 'aggregate of facts'

test." *$129,727.00 U.S. Currency*, 129 F.3d at 489. Accordingly, for the government to meet its burden, it must demonstrate that it had "reasonable grounds to believe that the [money] was related to an illegal drug transaction, supported by less than prima facie proof but more than mere suspicion." *United States v. $22,474.00 in U.S. Currency*, 246 F.3d 1212, 1215-16 (9th Cir. 2001) (alteration in original) (citation omitted). "To pass the point of mere suspicion and to reach probable cause, it is necessary to demonstrate by some *credible evidence* the probability that the money was in fact connected to drugs." *United States v. $30,060.00 in United States Currency*, 39 F.3d 1039, 1041 (9th Cir. 1994) (emphasis in original) (citation omitted). Credible hearsay or circumstantial evidence can be used to support probable cause. *See United States v. 1982 Yukon Delta Houseboat*, 774 F.2d 1432, 1434 (9th Cir. 1985); *United States v. 22249 Dolorosa St.*, 190 F.3d 977, 983 (9th Cir. 1999). We have held that "[e]vidence of a prior drug conviction is probative of probable cause" in drug trafficking cases. *$22,474.00 in U.S. Currency*, 246 F.3d at 1217.

The district court did not err in holding that the government established probable cause that the funds in question related to drug smuggling and money laundering. Hartog has twice been convicted on charges related to drug trafficking, first in 1979 and then again in 1993. The government presented statements from Hartog's ex-wife detailing her involvement in Hartog's marijuana smuggling escapades as early as 1974, including the exorbitant sums of money processed during their trade. Several of Hartog's former associates corroborate her recollection in statements to the F.B.I., likewise recounting the accumulated riches for those smuggling marijuana into the United States. Credible circumstantial evidence suggests that Hartog received millions of dollars from these shipments. Despite the interception of the smaller shipment in Hawaii, Hartog had told associates that they should still expect to distribute the larger shipment. Three months later, the government found $1.5 million in cash, along with kilograms of

marijuana in the locker of a Hartog associate. Hartog's partner was arrested that same month trying to launder $7.6 million at a Nevada casino. Indeed, that Hartog, working under an alias, moved to Canada and then sought the famed secrecy of Swiss and Caribbean banks to hold his funds further supports the government's case that the money related to illegal activity.

**[7]** Hartog argues that the uncertainty that the second larger shipment ever reached American shores creates a question of material fact rendering summary judgment inappropriate. *See United States v. Lot 4, Block 5 of Eaton Acres*, 904 F.2d 487, 490 (9th Cir. 1990) ("A genuine issue of fact exists when the nonmoving party produces evidence on which a reasonable trier of fact could find in its favor, viewing the record as a whole in light of the evidentiary burden the law places on that party.") Had the second shipment never arrived, Hartog continues, then the money in question could not have derived from that shipment. However, to establish probable cause, the government need not prove that the money in question derives from a specific transaction. *1982 Yukon Delta Houseboat*, 774 F.2d at 1435 n.4 ("There is no need to tie [the disputed assets] to the proceeds of a *particular identifiable* illicit drug transaction.") (emphasis in original). We have found that circumstantial evidence generally connecting funds to drug trafficking suffices to establish probable cause. *See, e.g., $22,474.00 in U.S. Currency*, 246 F.3d at 1216-17; *$129,727.00 in U.S. Currency*, 129 F.3d at 490. The government would succeed in demonstrating probable cause even if the second shipment never arrived. Hartog's prior previous drug trafficking convictions, the statements of his associates linking him to continuous drug smuggling, and his use of an alias and false identification while establishing foreign bank accounts all support probable cause independent of definitive proof of the second shipment's arrival.

**[8]** The district court also correctly determined that Hartog, after the burden shifted to him, could not prove by a prepon-

derance of evidence that forfeiture was inappropriate. *See $80,180.00 in U.S. Currency*, 303 F.3d at 1184. Hartog must demonstrate that the seized funds are unrelated to an illegal drug transaction. *See $129,727.00 U.S. Currency*, 129 F.3d at 492. Hartog's assertion that he inherited the funds from his father's estate is not credible. As the district court correctly observed, Hartog was entitled to slightly less than $120,000 from his father's estate—ten times less than the amount he deposited into the accounts. To explain this discrepancy, Hartog asserts that his father, Richard Hartog, hid millions of dollars of cash that he then collected upon his father's death. In an ostensible effort to support his claim, Hartog submits a declaration from his late father's attorney, Edgar Wm. Dwire. Although Mr. Dwire's declaration colorfully details some of Richard's business ventures, it offers nothing to substantiate Hartog's tale. Indeed, Mr. Dwire disclaims any personal knowledge as to the location of Richard's personal assets:

> Richard never talked about money. He was, in fact, extraordinarily discreet about his affairs. As a result, the only information about his wealth that I can recount has to do with the investments in which I represented him. . . . Richard [Hartog] kept safe deposit boxes, and I assume that he used these to store cash and other liquid assets, but, as I have stated, Richard was not one to tell anyone more than he needed to. This complimented me, in that I never ask for more information than I need.

Nor does Hartog provide any specific information, through his declaration or discovery responses, that help verify the amount or even the existence of the assets.[5] Hartog's bare

---

[5]Hartog contends that he cannot substantiate the existence of the funds due to the government's destruction of some of the files seized from his home during its investigation of the 1987 shipments. These files were destroyed in 1994 after Hartog pled guilty. It is unclear why Hartog believes the files contained evidence that would substantiate the existence of the funds in light of his declaration that he "never looked closely at these records." Nor does Hartog argue that these documents were improperly destroyed, or explain why these documents cannot be recreated based on other sources.

assertion that he came into an unspecified amount of cash after his father's death falls well short of the requisite preponderance of the evidence standard. Nor does this inherently untrustworthy story create a genuine issue of material fact. *United States v. Check No. 25128 in Amount of $58,654.11*, 122 F.3d 1263, 1265 (9th Cir. 1997). Therefore, the district court did not err by granting summary judgment in favor of the government.

### C. The Government Did Not Unreasonably Delay in Initiating the Forfeiture Proceedings.

Hartog argues that the government's delay in initiating the forfeiture proceedings violated his due process rights. Hartog points to the government's nearly five-year delay between seizing the funds in August 1993 and commencing the action in June 1998. Applying the four-prong test established in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the district court concluded that Hartog did not suffer undue delay. We review the determination of a delay's constitutionality de novo, *United States v. $292,888.04 in U.S. Currency*, 54 F.3d 564, 566 (9th Cir. 1995), and we agree with the district court.

**[9]** An unreasonable delay between seizure of property and a forfeiture action violates a claimant's right to due process. *United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 564 (1983). To determine whether a delay is unreasonable, we balance four factors: (1) the length of the delay; (2) the reasons for the delay; (3) the timing of claimant's assertion of his rights; and (4) prejudice to the claimant. *Barker*, 407 U.S. at 530; *Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. at 564-69. One factor by itself does not create a "sufficient condition for finding unreasonable delay. Rather, these elements are guides in balancing the interests of the claimant and the government to assess whether the basic due process requirement of fairness has been satisfied in a

particular case." *Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. at 565.

The first two factors, the length of and reasons for the delay, bolster Hartog's argument. In *Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in U.S. Currency*, the Supreme Court found that "short delays—of perhaps a month or so—need less justification than longer delays. We regard the delay here—some 18 months—as quite significant." *Id.* Hartog's delay totaled 58 months. Although not presumptively improper, this long delay stretches the elasticity of the test. *Id*. Nor does the government successfully explain why the delay was so extensive. We do credit the government's proffered need to investigate before bringing a forfeiture action, particularly since the government may not rely on evidence acquired after filing the complaint. *See United States v. $191,000 in U.S. Currency*, 16 F.3d 1066, 1070 (9th Cir. 1994). We further accept the government's explanation that the simultaneous criminal investigation against Hartog delayed the forfeiture action. However, these rationales can only go so far in explaining the nearly five-year delay. The government has failed to fully account for why its investigation and prosecution of Hartog resulted in such a disproportionate delay.

**[10]** However, Hartog's argument collapses under the weight of the last two factors. The manner and timing of the claimant's assertion of his rights to seized property may mitigate an otherwise unreasonable delay in initiating forfeiture. *Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. at 568-69. A claimant may file a motion to have his property returned or seek an order compelling the government to file its complaint and "[t]he failure to use these remedies can be taken as some indication that [the claimant] did not desire an early judicial hearing." *Id*. at 569. Hartog pursued neither avenue of relief while imprisoned. Not only did Hartog fail to assert his right to the money, he did not know his funds had been seized until the government initi-

ated its forfeiture action. The government's action, rather than depriving Hartog access to the money, put him on notice that the funds had been seized.

**[11]** Nor can Hartog claim any prejudice from the delay. Prior to the forfeiture action, Hartog had no access to the funds. He was not a signatory to the accounts in question. Only the government's seizure of the funds prevented Carbonneau, had he so chosen, from moving the funds. Hartog cannot fairly be considered to have been "deprived of the use of his property" when, prior to the forfeiture action, he did not possess it, have access to it, or have knowledge of its seizure. That the government destroyed some of Hartog's records during this time frame is more than offset by Hartog's speculation as to what the records may have shown and lack of attempt to obtain these records initially from the government or later from third parties. Balancing these four factors, we conclude that the five-year delay, while lengthy, did not constitute undue delay. Ironically, with the money languishing in his lawyer's personal account and Hartog's apparent ignorance as to its seizure, the government's forfeiture action represented Hartog's best opportunity to recover the funds in question.

## III.   CONCLUSION

Although the district court applied the incorrect test, it properly exercised jurisdiction over the approximately $1.67 million under a plain reading of 28 U.S.C. § 1355(b). The district court properly granted summary judgment and correctly held that Hartog did not suffer undue delay.

**AFFIRMED.**