**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff,*

and

OPTIONAL CAPITAL, INC., AKA
Optional Ventures,
*Claimant-Appellant,*

v.

DAS CORPORATION,
*Respondent-Appellee,*

and

475 MARTIN LANE, BEVERLY HILLS,
CALIFORNIA, Real Property, Located
at, et.al.,
*Defendants.*

No. 19-55128

D.C. Nos.
2:04-cv-02788-
ABC-PLA
2:04-cv-03386-
ABC-PLA
2:05-cv-03910-
ABC-PLA

OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, Chief District Judge, Presiding

Argued and Submitted April 15, 2020
Pasadena, California

Filed November 19, 2021

Before:  Daniel P. Collins and Kenneth K. Lee, Circuit
Judges, and Gregory A. Presnell,[*] District Judge.
Opinion by Judge Collins

## SUMMARY[**]

### Contempt

The panel affirmed the district court's post-judgment order denying Optional Capital, Inc.'s contempt motion on the ground that a May 2013 judgment did not require DAS Corporation to turn over $12.6 million to Optional.

At the end of a complex civil forfeiture proceeding that was litigated for nearly nine years, Optional was left as the sole remaining claimant.  After the competing claimants, including DAS, settled or were dismissed, Optional submitted a 2013 proposed final judgment, which the district court adopted, even though it could be construed as effectively reversing a 2011 ruling in which DAS had obtained a victory over Optional.  Five years later, Optional filed this action seeking to hold DAS in contempt for allegedly violating the 2013 judgment simply because DAS failed to do what the district court's 2011 order explicitly refused to order DAS to do.  The district court discharged its order to show cause, concluding that Optional failed to meet

---

[*] The Honorable Gregory A. Presnell, United States District Judge for the Middle District of Florida, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

its burden to show that DAS violated the 2013 final judgment.

Optional contended that because the 2013 judgment awarded it all funds in a Credit Suisse Account "as of August 8, 2005" or "when the Government served its warrant on or about August 8, 2005," the judgment could only be understood as extending to the entirety of the funds that were in the account on that earlier date, including the funds that had been transferred to DAS before the bench trial in the matter.  The panel concluded that the district court's use of the term "all funds" was ambiguous.  Turning to the record before the district court at the time it issued the judgment, the panel concluded that Optional's construction of the judgment was incorrect.  The panel held that the district court at the 2013 trial did not have before it, and did not undertake to decide, the competing claims of DAS and Optional to the $12.6 million that DAS had received from the Credit Suisse account in 2011.  In awarding Optional "all funds" from the account, the district court unmistakably was referring only to the funds that were at issue at that point in the trial, which did not include the $12.6 million that had previously been transferred to DAS.  The panel further held that by construing the judgment as it did, the panel avoided saddling it with other potential defects.

Because the 2013 judgment did not address Optional's and DAS's competing rights to the funds DAS had received from the Credit Suisse account in 2011, and did not award those funds to Optional, DAS did not violate the judgment by failing to turn over those funds to Optional.  The district court properly concluded that DAS could not be held in contempt on this basis.

**COUNSEL**

Ralph Rogari (argued), Rogari Law Firm P.C., Los Angeles, California; Mary Lee, Law Offices of Mary Lee, Los Angeles, California; for Claimant-Appellant.

Prashanth Chennakesavan (argued), James M. Lee, Joe H. Tuffaha, and Kevin B. Kelly, LTL Attorneys LLP, Los Angeles, California, for Respondent-Appellee.

**OPINION**

COLLINS, Circuit Judge:

We expect parties and their counsel to be vigorous in pursuing and defending their interests in court, especially when (as here) the other side behaves very badly. But even then, sometimes litigation maneuvers can go too far. This is such a case.

Towards the end of complex civil forfeiture proceedings that had been vigorously litigated for nearly nine years, Appellant Optional Capital, Inc. ("Optional") was ultimately left as the sole remaining claimant after the last set of competing claimants settled with Optional in the midst of a bench trial to fix the parties' rights in the remaining *res*. (Additional competing claimants had previously been voluntarily or involuntarily dismissed, including DAS Corporation ("DAS").) Optional completed the remainder of the then-uncontested bench trial, and it drafted and presented to the district court in 2013 a proposed final judgment. The literal terms of that proposed judgment, taken out of context, could potentially be construed as effectively reversing a 2011 ruling in which, prior to its

departure from the case, DAS had obtained a significant victory against Optional.  The district court did not catch the potential discrepancy, and it adopted the relevant language without modification.  Five years later, Optional instituted the current proceedings in which it now seeks to exploit the potential discrepancy: it seeks to hold DAS in contempt for allegedly violating the 2013 judgment simply because DAS failed to do what the district court's 2011 order explicitly *refused* to order DAS to do.  Optional claims that, in enforcing the judgment, the district court at this point could *not* consider the 2011 order and that the court instead was limited to examining only the four corners of the 2013 judgment and enforcing it in accordance with its literal terms—even if that was directly contrary to the 2011 order. The district court declined to go along with this remarkable argument, and it instead construed the 2013 judgment in a manner that rendered it consistent with the 2011 order.  We affirm.

## I

We set forth at some length the complex history of this bitter and protracted litigation, because it bears importantly on the issues presented in this appeal.

## A

Between 2004 and 2005, the United States filed a series of three related forfeiture actions that were consolidated in the district court and that all arose from alleged fraudulent activities committed by Christopher Kim ("Kim"), "a United States citizen working in South Korea," and others working in concert with him.  *United States v. Real Prop. Located at 475 Martin Lane* (*Real Prop. I*), 545 F.3d 1134, 1139 (9th Cir. 2008).  The particular property at issue in this appeal consists of "[a]ll funds in Credit Suisse Private Banking

account no. 0251-844548-6 in the name of Alexandria Investment, LLC," a California corporation organized by Kim's sister, Erica Kim (the "Credit Suisse Account"). According to the Government's forfeiture complaint, the more than $15 million in this account constituted, or were derived from, proceeds of fraudulent activities involving Kim's management and control of Optional Ventures Korea, Inc., whose successor is Optional. At the time it filed the relevant complaint, the Government had already sent a request in 2004 to Swiss authorities, pursuant to the applicable Mutual Legal Assistance Treaty ("MLAT"), to seize the Credit Suisse Account. On August 8, 2005, at the Government's request, the district court also ordered the seizure and arrest of the Credit Suisse Account.

The putative owners of the various properties sought to be forfeited—Kim, his sister Erica Kim, his wife Bora Lee, his parents, First Stephora Avenue, Inc. ("First Stephora"), and Alexandria Investments, LLC ("Alexandria") (collectively, "the Kim Claimants")—contested the forfeiture actions. *Real Prop. I*, 545 F.3d at 1139. Optional, which by that time was no longer under control of the Kim Claimants, filed competing claims to the property, as did DAS, another South Korean company and an "alleged corporate victim of Kim's fraud." *Id*.

In September 2005, the district court partially dismissed, as untimely filed, the Government's forfeiture proceedings with respect to some of the properties (but not the Credit Suisse Account), and the district court subsequently held that, as a result, it "no longer had jurisdiction to adjudicate competing claims to the dismissed properties." *Id*. at 1140. We reversed both rulings on appeal. *Id*. at 1141–47.

In March 2007, while that appeal remained pending and undecided, the district court granted summary judgment to

the Kim Claimants as to the Credit Suisse Account and the other remaining properties in the forfeiture action, concluding that the Government had failed to present "admissible evidence that could support a finding that Kim carried out the fraud and embezzlement scheme that the Government describes" and that the evidence presented by Optional and DAS in support of the Government's position was likewise inadequate. On appeal, we affirmed the district court's grant of summary judgment against the Government and in favor of the Kim Claimants. *United States v. Real Prop. Located at 475 Martin Lane* (*Real Prop. II*), 298 F. App'x 545, 549 (9th Cir. 2008) (decided the same day as *Real Prop. I*). We nonetheless rejected the Kim Claimants' cross-appeal, which had sought to challenge the district court's assertion of jurisdiction over the Credit Suisse Account. *Id.* at 551. As we explained, under *United States v. Approximately $1.67 Million*, 513 F.3d 991 (9th Cir. 2008), "actual or constructive control over defendant property located in a foreign country is not required" in order to obtain *in rem* jurisdiction in a forfeiture action. *Real Prop. II*, 298 F. App'x at 551.

During the proceedings on remand from our decisions in *Real Prop. I* and *Real Prop. II*, the Government informed the district court at a November 2008 status conference that, in light of the dismissal of its claims, the Government was no longer in a position to ask the Swiss Government to continue to freeze the Credit Suisse Account pursuant to the earlier MLAT request. The Government noted, however, that an ongoing Swiss criminal investigation (which had been triggered by a criminal complaint from DAS) might result in the freeze continuing.

In October 2009, the district court granted motions filed by the Kim Claimants and dismissed all claims asserted by

DAS and Optional against the subject properties in the forfeiture proceedings. *United States v. DAS Corp.*, 406 F. App'x 154, 157 (9th Cir. 2010). In December 2010, we reversed those rulings as to DAS and Optional, concluding that, notwithstanding the dismissal of the Government's forfeiture claims, the competing claims of DAS and Optional had not been addressed or resolved by our prior rulings. *Id*. at 159. We therefore remanded the case "for the district court to adjudicate DAS's and Optional's claims against" the properties that had been subject to the Government civil forfeiture action, including the Credit Suisse Account. *Id*.

**B**

While the forfeiture action was ongoing, Optional and DAS each took additional steps to secure their positions. In 2004, Optional sued its former directors—Kim, Erica Kim, and Bora Lee—as well as First Stephora and Alexandria (collectively, "the Kim Defendants") in the Central District of California, and that case was assigned to the same district judge as the forfeiture proceedings. *See Optional Cap., Inc. v. Kim*, 414 F. App'x 12, 13 (9th Cir. 2011). At the trial of Optional's suit against the Kim Defendants, a jury awarded Optional (1) 37.1 billion South Korean won (around $31.8 million today) based on a claim for conversion; and (2) an additional $31,000,000 (denominated in dollars), with half of that amount resting on one of two fraud claims and the other half resting on the other fraud claim. The district court, however, granted the Kim Defendants' motion for judgment as a matter of law on all three claims. *Id*. On appeal, we affirmed as to the fraud claims, but we reversed the grant of judgment as a matter of law on the conversion claim and directed the district court to reinstate the jury's award of 37.1billion won. *Id*. at 15–16. The district court did so on February 7, 2011.

Meanwhile, in 2003, DAS sued Kim, Erica Kim, Bora Lee, and others in California state court. *See DAS Corp. v. Kim*, 2008 WL 4901097, at *1 (Cal. Ct. App. Nov. 12, 2008).[1]  That action was dismissed on the pleadings, but the California Court of Appeal partially reversed that dismissal in 2008. *Id*. at *6.  In 2007, DAS also filed a criminal complaint in Switzerland against Kim for money laundering, which (as noted earlier) led to the Swiss government's freezing of the Credit Suisse Account.  In late 2010, however, DAS confidentially reached a settlement with the Kim-related parties.  Pursuant to that settlement, DAS dropped its California lawsuit and sought to withdraw its Swiss money laundering criminal complaint.  In response to DAS's request to withdraw that criminal complaint, and with Alexandria's consent, the Swiss Attorney General's Office on February 1, 2011 unfroze the Credit Suisse Account and ordered the Swiss bank to wire $12.6 million from that account to DAS's account in Korea.

Remarkably, DAS did not initially inform the district court (or Optional) that it had taken these steps.  Instead, on April 4, 2011, DAS filed a one-sentence "Notice of Withdrawal of Claims" in the federal forfeiture proceedings stating, without explanation, that it was withdrawing its claims in those proceedings.  The court only found out when, after ordering the Government (even though a non-party) to file a status report concerning the Credit Suisse Account, the Government on April 11, 2011 informed the court that "its undersigned counsel learned for the first time on April 8, 2011" that the Swiss authorities apparently had lifted the freeze on the Credit Suisse Account and that funds may have been released from the account "to whereabouts unknown."

---

[1] The state court decision erroneously refers to Erica Kim as Kim's wife and to Bora Lee as his sister.  *See* 2008 WL 4901097, at *1 n.1.

One week later DAS filed a court-ordered status report disclosing for the first time that its California suit had been dismissed, that the Swiss criminal proceeding had been concluded, and that "certain funds" had been transferred from the Credit Suisse Account "to an account of DAS." In response to this disclosure, the district court expressed its understandable "dismay[]" that, despite the court's retention of *in rem* jurisdiction over the Credit Suisse Account, DAS had been "silent on this crucial issue" until the court-ordered reports had brought the matter to light. The court ordered DAS to be prepared to "fully explain" the matter at the upcoming May 2011 status conference, and it warned that, if DAS did not do so, the court might, *inter alia*, hold DAS in contempt and refer its counsel to the state bar.

After that status conference, the district court issued an order stating that "no party is to interfere with or disturb whatever monies remain in the Credit Suisse accounts," and it invited Optional to file appropriate motions "seeking action from the Court with respect to the Credit Suisse accounts and/or monies received by DAS" and "moving for an order of contempt against parties and/or counsel based on the developments in Switzerland." The court also formally requested that "the Government investigate the transaction in Switzerland" by which the transfer to DAS had been accomplished.

On May 16, 2011, Optional proceeded to file a motion seeking to have DAS held in contempt for assertedly violating prior orders of the court, and it simultaneously moved to compel DAS to deposit with the clerk of court the $12.6 million DAS had received. In a June 2011 order, the district court denied both of Optional's motions. As to the contempt motion, the district court found that none of its prior orders "were sufficiently specific or clear to support a

finding of contempt." Although DAS's actions had "disregarded the spirit" of a prior court order, the court could not "say that DAS violated the letter of any order issued by th[e] Court." As to the motion to compel, the district court noted that, despite its *in rem* jurisdiction, the court lacked actual control over the account and that DAS had obtained the funds through lawful "processes in Switzerland, the jurisdiction that did have actual control over the accounts." In the absence of such control, the court concluded that it "cannot compel DAS to surrender the funds." The court acknowledged that, as a technical matter, it still had "jurisdiction to decide the competing claims" of DAS and Optional, but it noted that DAS's reduction of "the value of the *res*" threatened "to render any such decision a merely academic exercise." Optional filed a petition for a writ of mandamus challenging the district court's June 2011 order, but we denied the petition without comment.

In November 2011, the district court granted DAS's opposed motion to be dismissed from the forfeiture proceedings. The court concluded that most of Optional's arguments against DAS's dismissal had already been rejected by the court in its June 2011 order: "As the Court stated in that order, there appears to be no ground for ordering DAS to surrender the funds to this Court's custody in light of the fact that DAS obtained those funds through the legal process of an authority that had both jurisdiction and actual control over the account from which they came" and DAS's conduct in doing so did not violate any court order. The court explained that its task at this point was to "adjudicate the *remaining* competing claims to the property," and it noted that DAS had withdrawn its claims as to that remainder. The court concluded that, "[g]iven that DAS has withdrawn its claims, and that the Court is not going to order DAS to surrender the funds, DAS's presence

in this case is superfluous." The court therefore dismissed DAS from the forfeiture proceedings with prejudice. Optional filed a notice of appeal challenging both the November 2011 dismissal order and the June 2011 order declining to order DAS to return the funds, but we dismissed those appeals for lack of jurisdiction on the grounds that there was no final judgment in the forfeiture proceedings.

## C

In May 2012, Optional moved for summary judgment in the forfeiture proceedings, asking the district court to reject the competing claims of the Kim Claimants and to release to Optional, *inter alia*, "all remaining funds" in the Credit Suisse Account. The district court denied Optional's motions, as well as the Kim Claimants' cross-motion, concluding that neither Optional nor the Kim Claimants had shown their entitlement to the properties as a matter of law.

On April 30, 2013, the case proceeded to a bench trial. In its pretrial "Memorandum of Contentions of Law and Fact," Optional described all of the property at issue, and, as to the Credit Suisse Account, it stated that "[t]he Claimants to any money *left* in this account are Optional, [Christopher] Kim and Bora Lee" (emphasis added). On the second day of trial, Optional reached a sealed settlement with the Kim Claimants. Under that settlement, Optional withdrew its claims to certain property claimed by Kim's parents, and the Kim Claimants withdrew their claims as to all other properties, including the Credit Suisse Account. In their subsequently filed formal withdrawal, the Kim Claimants stated that they withdrew their claims to, *inter alia*, "[a]ll funds *remaining*" in the Credit Suisse Account (emphasis added). After the settlement was placed on the record, the district court allowed Optional to proceed to present additional evidence "tracing the funds the Kim Claimants

converted from Optional to the properties to which Optional had outstanding claims." Optional did so, and it rested on the second day of trial.

Although Optional's and the Kim Claimants' papers had made clear that the trial only involved the funds "left" or "remaining" in the Credit Suisse Account, Optional's post-trial proposed findings of fact and proposed judgment described the relevant property more vaguely as either "[a]ll funds in Credit Suisse Private Banking Account No. 0251-844548-6 in the name of Alexandria Investment, LLC when the Government served its warrant on or about August 8, 2005" or "[a]ll funds in Credit Suisse Private Banking Account No. 0251-844548-6 in the name of Alexandria Investment, LLC as of August 8, 2005." The only objections to the proposed findings and judgment were filed by the Government and a bank, but the district court rejected their objections because the two objectors were only asserting "liens" and not "claims." On May 23, 2013, the court entered its findings of fact and conclusions of law, holding that, because Optional was "the only *claimant*" to the properties at issue, "Optional is entitled to them by default" (emphasis added). In both its findings and its final judgment, the court followed verbatim Optional's descriptions of the Credit Suisse Account funds that were awarded to Optional. The district court retained jurisdiction "for the purpose of ensuring prompt and complete compliance." No one filed an appeal from the district court's judgment.

## D

In December 2011, shortly after DAS's dismissal from the civil forfeiture case, Optional sued DAS in California superior court. As later amended, DAS's complaint alleged conversion, fraudulent transfer, and receipt of stolen property with respect to the $12.6 million transferred from

the Credit Suisse Account to DAS. *See* First Amended Complaint, *Optional Cap., Inc. v. DAS Corp.*, No. BC474472, 2014 WL 12889308 (L.A. Super. Ct. Mar. 24, 2014). In 2016, Optional moved for summary adjudication on its claims, asserting that, because the May 2013 judgment in the federal forfeiture proceedings extended to "[a]ll funds in Credit Suisse Private Banking Account No. 0251-844548-6 in the name of Alexandria Investment, LLC as of August 8, 2005," that judgment conclusively established that Optional was entitled to the $12.6 million that DAS had received from that account in February 2011. The state court denied the motion. Noting that "at the time judgment was entered, DAS was not a party to the forfeiture action" or "in privity with any party," the court concluded that Optional had failed to establish "that the judgment in the forfeiture action has any res judicata or collateral estoppel effect."

The case proceeded to trial in 2019, and the jury issued a verdict for DAS as to Optional's conversion and fraudulent transfer claims, but it awarded Optional $2 million on its claim that DAS had received stolen property from Alexandria. *See Optional Cap., Inc. v. DAS Corp.*, 2021 WL 5176215, at *5–6 (Cal. Ct. App. Nov. 8, 2021). As to the stolen-property claim, the California Court of Appeal reversed and directed entry of judgment for DAS, concluding that there was "no evidence that DAS knew that all the funds in Alexandria's Swiss account belonged to Optional." *Id*. at *8. The state appellate court rejected Optional's reliance on the May 2013 judgment in the federal forfeiture proceedings, holding (*inter alia*) that a "fair reading of the 2013 judgment is that notwithstanding the court's reference to funds in the Swiss account 'as of' 2005, the judgment included only funds *currently* in the account, *i.e.*, as of 2013." *Id*. at *9 (emphasis added).

**E**

On July 23, 2018, more than five years after the May 2013 forfeiture judgment was entered, Optional filed an application with the district court for an order directing DAS to show cause why it should not be held in contempt for failing to comply with that judgment's asserted requirement to deliver to Optional the $12.6 million DAS obtained from the Credit Suisse Account.  The case had by then been reassigned to a new district judge, and the court issued an order to show cause and set a briefing schedule.  After receiving that briefing, the district court on December 28, 2018 discharged the order to show cause, concluding that Optional had "failed to meet its burden to show that DAS violated the Court's May 23, 2013 final Judgment."

In reaching that conclusion, the district court held that the terms of the May 2013 judgment should be evaluated in the context of the forfeiture proceedings.  Although DAS asked the court to take judicial notice of a number of documents from the forfeiture case and other related proceedings, the court took judicial notice only of the May 2013 judgment, the June 2011 order, and the transcript of the May 2011 status conference.  Noting that the June 2011 order had specifically declined to require DAS to deposit the $12.6 million with the court, the district court held that, "based on the plain reading of the Judgment," the May 2013 judgment "did not require DAS to return any funds it received from the Credit Suisse account in 2011." Optional's contrary reading, the court concluded, "require[d] a tortured reading" of the 2013 judgment.  The court also concluded that, because the transferred funds were no longer in the Credit Suisse Account at the time of the 2013 judgment, it was unreasonable to read the judgment as extending to those funds.  Accordingly, the court discharged

the order to show cause and declined to hold DAS in contempt. The court also denied Optional's subsequent motion for reconsideration.

Optional timely appealed, and we have jurisdiction under 28 U.S.C. § 1291. *See Sanders v. Monsanto Co.*, 574 F.2d 198, 199 (5th Cir. 1978) ("[I]f a motion for civil contempt is denied after the entry of the judgment which was the subject of the contempt, the denial is final and reviewable because no further district court action is necessary to give life to the denial."); *see also Sportmart, Inc. v. Wolverine World Wide, Inc.*, 601 F.2d 313, 316 (7th Cir. 1979) (similar); *Stringfellow v. Haines*, 309 F.2d 910, 911 (2d Cir. 1962) (similar); *cf. Shuffler v. Heritage Bank*, 720 F.2d 1141, 1145 (9th Cir. 1983) ("Where the contempt proceeding is the sole proceeding before the district court, an order of civil contempt finding a party in contempt of a prior final judgment and imposing sanctions is a final decision under section 1291.").

## II

Civil contempt "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). To succeed on its request to hold DAS in civil contempt, Optional was required to show, by "'clear and convincing evidence,'" that (1) DAS had violated the terms of the May 2013 judgment; (2) that DAS's conduct went beyond the sort of technical violation that would be consistent with "'substantial compliance'"; and (3) that DAS's violation was "'not based on a good faith and reasonable interpretation of the order.'" *Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009) (quoting *In re Dual Deck Video*

*Recorder Antitrust Litig.*, 10 F.3d at 695). The district court determined at the first prong that DAS did not violate the May 2013 judgment because "the Judgment did not require DAS to return any funds it received from the Credit Suisse account in 2011." Although we ordinarily review a district court's decision to deny a motion for contempt for abuse of discretion, *Hallett v. Morgan*, 296 F.3d 732, 749 (9th Cir. 2002), a "district court by definition abuses its discretion when it makes an error of law," *Koon v. United States*, 518 U.S. 81, 100 (1996), and the interpretation of a judgment presents a question of law that we review de novo. *See Lowenschuss v. Selnick* (*In re Lowenschuss*), 170 F.3d 923, 929 (9th Cir. 1999); *SEC v. United Fin. Grp.*, 576 F.2d 217, 222 (9th Cir. 1978). Accordingly, we review de novo whether the district court properly denied Optional's contempt motion on the ground that the May 2013 judgment did not require DAS to turn over the $12.6 million to Optional. We hold that the court did not err.

**A**

When construing a judgment, we look to the "natural reading of its text." *Ruiz v. Snohomish Cnty. Pub. Util. Dist. No. 1*, 824 F.3d 1161, 1167 (9th Cir. 2016). "If the judgment is unambiguous, the court may not consider 'extraneous' evidence to explain it." *Narramore v. United States*, 852 F.2d 485, 490 (9th Cir. 1988) (quoting *Gila Valley Irrigation Dist. v. United States*, 118 F.2d 507, 510 (9th Cir. 1941)). Invoking these principles, Optional contends that because the May 2013 judgment awards it "[a]ll funds" in the Credit Suisse Account "as of August 8, 2005" or "when the Government served its warrant on or about August 8, 2005," the judgment can *only* be understood as extending to the entirety of the funds that were in the account on that

earlier date, including the funds that had been transferred to DAS before the bench trial in the matter.  We disagree.

As the judgment reflects, the "August 8, 2005" limitation is significant because it fixes the discrete pool of funds that were the subject of the Government's "warrant" in connection with its forfeiture complaint.  *Those* particular funds residing in that account on that date were alleged proceeds of fraudulent activity, according to the Government, and funds *not* in that account as of that date were not at issue.  But when, eight years after the Government's original warrant, the language of the district court's judgment indiscriminately awarded Optional "all" such funds, was it referring to "all" of the funds from that pool that were *then at issue*, "all" of the funds *then* in that pool, or all of the funds *originally* in that pool (even if they were no longer in the account)?  Optional thinks that the mere use of the word "all," coupled with the August 8, 2005 date unambiguously settles this issue in favor of the third option, but that is wrong.  On its face, the judgment contains an express recital that its award of property rights rests on the "claims" that "were tried" by the court, and that crucial reference makes it at least equally plausible—if not more plausible—to construe the ensuing award of "all" such funds as referring only to those funds *at issue in the referenced trial*.  The resulting ambiguity in the use of the term "all funds," in the context of this judgment, is underscored by the fact that, in contrast to the judgment's more generic description of this one item concerning the Credit Suisse Account, every other item of property awarded by the judgment uses highly specific descriptions that include exact dollar amounts or that otherwise describe physical items of property with notable particularity (*e.g.*, providing exact VIN numbers for vehicles).

Because we conclude that the judgment is ambiguous in this respect, our obligation is to "'construe [the] judgment so as to give effect to the intention of the issuing court,'" considering "'the entire record before the issuing court,'" including "'findings of fact.'" *Ruiz*, 824 F.3d at 1167 (quoting *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355, 1359 (9th Cir. 1998)). Because the inquiry focuses on "the intention of the court as expressed in the decree," we do not consider any evidence that is extrinsic to the record before that court. *Gila Valley*, 118 F.2d at 510 (extrinsic evidence concerning negotiation of consent decree could not be considered); *cf. Narramore*, 852 F.2d at 490–91 (extrinsic evidence, outside the original record, may be received in evaluating whether a party's subsequent actions differ from what was contemplated by the decree). Turning to the record before the district court at the time it issued the judgment, we have little difficulty concluding that Optional's construction of the judgment is incorrect.

In contending that the May 2013 judgment should be construed to extend to the $12.6 million that DAS received from the Credit Suisse Account in February 2011, Optional relies heavily on the fact that, in defending against Optional's May 2011 contempt motion, DAS told the district court that the transfer of funds did not divest the court "of *in rem* jurisdiction" over the funds and did not affect the court's ability to "decide the claims before it." DAS's position at that time was that the district court could proceed to adjudicate the parties' competing claims of ownership, but that the court continued to lack control over the funds and therefore lacked authority to order the funds to be transferred to the U.S. The problem with Optional's reliance on these May 2011 comments is that the record of the subsequent proceedings makes unambiguously clear that the district

court did *not* undertake to decide the parties' competing ownership interests in the $12.6 million.

In particular, Optional overlooks what the district court did when it ruled on DAS's November 2011 motion to be dismissed from the forfeiture proceedings. The district court expressly acknowledged that, in opposing that motion, Optional "argue[d] that because DAS obtained funds from the seized Swiss account, DAS should be kept in the case" so that the court could "adjudicate the remaining claims over the res *now in DAS's custody*" (emphasis added). However, the court rejected these arguments, stating that it had already held that there was "no ground for ordering DAS to surrender the funds," and it reiterated in no uncertain terms that it was "not going to order DAS to surrender the funds." In response to Optional's argument that "the Ninth Circuit mandate" in *U.S. v. DAS Corp.* "order[ed] the Court to adjudicate competing claims to the property," the district court concluded that it could "still adjudicate the *remaining* competing claims to the property even though the value of the account has been diminished." Thus, while the court acknowledged that it theoretically had "jurisdiction" to decide the parties' competing claims to the $12.6 million that had been transferred to DAS from the Credit Suisse Account, the court made clear that it was *not* going to decide that issue. Given that DAS had formally withdrawn its claims to the remaining *res*, there was "no reason why DAS must remain in this case," and the court therefore dismissed DAS from the forfeiture proceedings.

Thereafter, the remaining parties to the forfeiture proceedings, including Optional, proceeded on the same basis. When Optional moved for summary judgment against the Kim Claimants in May 2012, it asked the court to reject their claims to "*all remaining funds* in Credit Suisse Private

Banking Account 0251-844548-6" (emphasis added). And after summary judgment was denied and the case proceeded to trial, Optional's trial brief explicitly stated that what was at issue in that trial was "any money *left* in this account" (emphasis added).

Given this record, it is quite clear that the district court at the 2013 trial did not have before it, and did not undertake to decide, the competing claims of DAS and Optional to the $12.6 million that DAS had received from the Credit Suisse Account in 2011. In awarding Optional "all funds" from that account, the district court unmistakably was referring only to the funds that were at issue at that point in the trial, which did not include the $12.6 million that had previously been transferred to DAS.

**B**

If we had any residual doubt on this point—and we do not—we would be compelled to construe the judgment the same way in order to preserve its validity. *See* 46 AM. JUR. 2D JUDGMENTS § 67 (2021) ("In construing a judgment, it may be presumed that the court intended to render a valid, and not a void, judgment."). Had the district court undertaken to decide DAS's rights to the $12.6 million *after* DAS was no longer a party to the proceedings—as Optional contends—that would have raised serious due process concerns that would cast doubt on the judgment's validity and enforceability. *Cf. Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) ("A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit." (citation omitted)). Moreover, were we to agree with Optional that (1) by adopting *Optional's* wording of the *res* at issue in its judgment and findings, the district court thereby *must* be understood as having adjudicated the competing rights of

DAS and Optional to the $12.6 million, and (2) the overwhelming contrary evidence in the record *must* be disregarded because it is not within the four corners of the judgment, we would be upholding a judgment as to which there was at least a substantial question whether it was procured by a fraud on the district court.[2]  *Cf. Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (stating that a court's "inherent power . . . allows a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court").  By construing the judgment as we have done, we avoid saddling it with these potential defects.

## III

Because the May 2013 judgment did not address Optional's and DAS's competing rights to the funds DAS had received from the Credit Suisse Account in 2011, and did not award those funds to Optional, DAS did not violate that judgment by failing to turn over those funds to Optional. The district court therefore properly concluded that DAS could not be held in contempt on this basis.  In reaching this conclusion, we have not been called upon to address, and have not addressed, any question concerning whether the various orders that merged into the May 2013 judgment were

---

[2] We do not decide whether any such fraud on the court did or did not occur.  We merely observe that, given the significant contradiction between the district court's pretrial rulings and what Optional now contends is the meaning of the judgment, a substantial question would be raised as to whether Optional intentionally submitted a proposed judgment that could potentially mislead the court into unwittingly adopting language that was contrary to its prior rulings.  Where, as here, an alternative reading of the judgment is available that avoids raising that sort of serious question as to the judgment's validity, we should and do adopt that construction.

or were not correct.  As noted earlier, that judgment was never appealed, and no such issue is before us.

**AFFIRMED.**